UNITED STATES of America

v.

Paul W. EGGERS, G.H. Lincecum, Valerie Miremadi a/k/a "Valerie Benson" and Anthony Miremadi, Defendants.

No. S1 97 CR. 1004(LAK).

United States District Court, S.D. New York.

May 19, 1998.

As Amended May 26, 1998.

Peter Neiman, Assistant United States Attorney, Mary Jo White, United States Attorney, for the United States of America.

Andrew H. Schapiro, The Legal Aid Society, Federal Defender Division, for Defendant Valerie Miremadi.

Hal Meyerson, Meyerson & Ramos, New York City, for Defendant Anthony Miremadi.

J. Bradley Bennett, Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, for Defendant Paul W. Eggers.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Valerie and Anthony Miremadi seek to suppress certain documents, seized during the course of their arrests and a subsequent search of their home, on the grounds that the documents were obtained in violation of the Fourth and Fifth Amendments to the United States Constitution. In particular, the Miremadis argue that (1) certain documents seized from their home must be suppressed as fruit of an unwarned custodial interrogation in violation of the Fifth Amendment, and (2) certain other documents must be suppressed because the Miremadis' consent to search their home was not voluntarily given and the documents seized during that search therefore were obtained in violation of the Fourth Amendment.

For the reasons that follow, the motion to suppress documents seized as the result of the alleged custodial interrogation is denied, and the motion to suppress documents seized during the subsequent search of the Miremadis' home is granted.

### Background[1]

Anthony and Valerie Miremadi, Paul W. Eggers and G.H. Lincecum were indicted in this Court on September 26, 1997 on charges of conspiracy to commit wire fraud in connection with an investment program involving a couple named Ilse and Herbert Erpel. Arrest warrants and a search warrant for the offices of Eggers and Lincecum issued on May 8, 1997. No search warrant ever was sought or obtained as to the Miremadis' residence or business. Soon thereafter, Secret Service Agent Thomas Atkinson, the case agent, traveled to Los Angeles to arrest Anthony Miremadi and his wife, Valerie. Atkinson was assisted in Los Angeles by fellow Secret Service Agents Jacqueline Marengo, Jack Peterson, and Peter Damos.[2]

On the afternoon in question, the four agents first arrested Anthony Miremadi at his place of business.[3] The agents read Mr. Miremadi the *Miranda* warnings and handcuffed him. According to Agent Atkinson, Mr. Miremadi seemed surprised and expressed concern about his three daughters who would be returning home from school shortly.[4] The agents gathered Mr. Miremadi's belongings and placed him in the back of one of their two unmarked cars. They proceeded next to the Miremadis' home a few minutes away in order to arrest Valerie Miremadi. Once there, Agent Atkinson and Marengo approached the door with guns visible below their jackets, and Atkinson knocked on the door. When Valerie Miremadi opened it, Agent Atkinson announced that he had a warrant for her arrest. Exactly what happened next was the subject of conflicting testimony.

### Alleged Custodial Interrogation

All of the witnesses agreed that Valerie Miremadi immediately became very agitated and excited upon being told that she was

1. The Court held an evidentiary hearing on March 9–10, 1998. The transcript of that hearing is referred to as "Tr."

2. Agents Marengo, Peterson and Damos all are based in Los Angeles and were brought in purely to execute the arrest warrants. So far as the record discloses, they played no investigative role

and had no knowledge of the facts of the case other than what they observed during the arrests.

3. Tr. at 6–7.

4. Tr. at 7–9.

under arrest and began asking questions of the agents regarding the basis for her arrest. As a result of her agitation, no doubt, the agents failed to follow the standard procedures normally attendant to an arrest. They did not immediately read her the *Miranda* warnings, nor did they restrain her.

Agent Atkinson testified that, as he explained the charges to her, Ms. Miremadi turned around and began walking into the house.[5] Although he conceded that he did not know where she was going, what she was doing, or even whether other people were in the house at the time, Agent Atkinson said that he nevertheless followed her into the house, down a short hallway, through the kitchen and a wide-open living room, and finally into an office area in the rear.[6] Once in the office area, Agent Atkinson recalled, Ms. Miremadi protested her innocence of the charges by voluntarily picking up certain documents and showing them to him.[7] The first documents she picked up, Agent Atkinson admitted, had nothing to do with the investment scheme he had been investigating, but he seized them from her anyway.[8] The second item Ms. Miremadi picked up was a green folder containing documents; she held it out toward Agent Atkinson and riffled through the contents within his view. Atkinson testified that he was able to observe the names of investors and other relevant information regarding the investment scheme.[9] Consequently, he took the folder from Ms. Miremadi and another document he noticed lying on the desk.[10] Ms. Miremadi protested that she did not give him permission to take the documents, but Agent Atkinson replied that he could take them because they were in plain view.[11]

Ms. Miremadi offered a different account of the events leading up to the seizure of these documents. She contended that after being told she was under arrest, she backed up into the house and that Agents Atkinson and Marengo followed her into the entry way.[12] At that point, she said, she asked "what it was all about," and Agent Atkinson explained to her that it was a fraud case involving the Erpels.[13] According to Ms. Miremadi, Agent Atkinson then asked whether she had any documents relating to the Erpels in the house and, if so, whether he could see them.[14] Ms. Miremadi stated that she replied affirmatively and that only then did she lead the two agents through the house and into the office area.[15] She said she then handed Agent Atkinson a file marked "Erpels" from a stack of closed files on her desk and, when Agent Atkinson asked to see the other files, she refused, saying she did not think they were relevant to the Erpel investigation.[16]

Ms. Miremadi testified that she then told the agents that she needed to make arrangements for her three daughters, who would be coming home from school shortly. The agents permitted her to do so.[17] Shortly thereafter, according to Ms. Miremadi, Agent Atkinson sat her down in the kitchen and asked her more questions about her involvement in the investment schemes.[18] During this conversation, Atkinson allegedly told her that "97 percent of the people that we arrest are convicted," that she was in a lot of trou-

---

5. Tr. at 10.

6. Tr. at 10–12, 38–39, 42–44.

7. Tr. at 12.

8. GX 2; Tr. at 42.

9. GX 4; Tr. at 14–15.

10. GX 3; Tr. at 13–17.

11. Tr. at 17.

12. Tr. at 134. Agent Marengo gave yet a third account of the events. According to her, the agents only entered the house after someone said "we can talk about this." Tr. at 95. Although Marengo did not say who exactly said that, it seems from the context that Agent Atkinson said "we can talk about this" in response to Ms. Miremadi's emotional reaction.

13. Tr. at 134–35.

14. Tr. at 135.

15. *Id.*

16. Tr. at 137.

17. Affidavit of Valerie Miremadi ¶ 5 (hereinafter "Miremadi Aff.").

18. Tr. at 137–138.

ble, facing a lot of jail time, and would be better off if she cooperated with the investigation.[19]

It is undisputed that Agent Atkinson neither read Ms. Miremadi *Miranda* warnings nor otherwise advised her of her rights prior to seizing the documents from the office.[20] Atkinson conceded that he failed to advise Ms. Miremadi of her *Miranda* rights until some twenty or thirty minutes later.[21] Atkinson testified that, after he advised her of her rights, Ms. Miremadi asked to speak with an attorney. He said that he told her that it was her right and "didn't ask her any further questions at that time."[22]

*Consent to Search*

Ms. Miremadi then was handcuffed in her house and taken outside to one of the cars. The agents subsequently brought Anthony Miremadi into the house and asked whether he would be willing to sign a consent form.[23] He stated that he wanted to speak with his wife, so Ms. Miremadi was led back into the house and placed at the kitchen table with her husband.[24] Agent Damos then read the Miremadis the *Miranda* warnings and again requested consent to search their home.[25] Ms. Miremadi responded by asking again to speak with her attorney, and the agents allowed her to call him on the telephone.[26] Ms. Miremadi's attorney advised her not to give consent to search the house nor to show the agents anything.[27] The attorney then requested to speak with one of the agents.[28] Agent Atkinson testified that he got on the phone, and the attorney advised him that he

did not want either of the Miremadis to sign the consent to search form or to speak further with the agents.[29]

After Agent Atkinson got off the phone, Ms. Miremadi contended, he remarked, "OK, if that is how you want to do it, that is fine, but it's a big mistake. You are just going to make it harder on yourself. It's just going to be harder this way."[30] Ms. Miremadi testified also that Agent Atkinson advised her that her school-age daughters would be permitted to enter the house if she consented to a search, but that they would not be allowed back in until a warranted search was conducted, perhaps not for several days, if consent was refused.[31] According to Ms. Miremadi, Agent Atkinson added that the agents had "enough to get a warrant."[32] Atkinson admitted that at some point he told the Miremadis that he had already seen lots of evidence of a crime, that there was a possibility the agents would try to get a warrant, and that he would like them to cooperate.[33] He did not deny having made the statements about when the Miremadi children would be permitted to return to the house. In any case, Ms. Miremadi continued to refuse consent to search the house.[34]

The agents then re-handcuffed the Miremadis and took them back outside to separate cars.[35] Ms. Miremadi was placed in a car with Agents Marengo and Peterson, while her husband rode in another vehicle with Agents Atkinson and Damos.[36] About thirty minutes into the ride to downtown Los Angeles, Ms. Miremadi inquired what would

---

**19.** Tr. at 137.

**20.** Tr. at 12, 137.

**21.** Tr. at 19. Ms. Miremadi contends that she was not Mirandized until she was brought back in the house later, but for purposes of this motion this disparity in the testimony is immaterial.

**22.** Tr. at 20.

**23.** *Id.*

**24.** Tr. at 21.

**25.** Tr. at 21, 140.

**26.** Tr. at 21.

**27.** Tr. at 140.

**28.** *Id.*

**29.** Tr. at 22.

**30.** Tr. at 141.

**31.** Miremadi Aff. ¶ 12.

**32.** *Id.*

**33.** Tr. at 34, 53.

**34.** Miremadi Aff. ¶ 12; Tr. at 141.

**35.** Tr. at 22, 141.

**36.** Tr. at 22, 142.

happen if the agents obtained the search warrant.[37] Agent Peterson testified that he told her that the agents would apply for a warrant and that a team of agents would come back and execute it.[38] He said he told her that the agents would "seal down" the residence until they could come back with a warrant,[39] although the agents admittedly did not seal the house when they left it, but simply locked the door. Ms. Miremadi claimed she asked how long it would take before her children could get back into the house and that Peterson said it would "probably be a day, maybe two." [40]

In addition to concern about her children's return to their home, Ms. Miremadi was troubled about how a search pursuant to a warrant would be conducted. She asked Agent Peterson whether it would involve mattress slashing, destruction of personal items and so on.[41] Peterson testified that he told her "in no way would agents do that.... A thorough search of the residence, of the entire residence, would be conducted and in no way would we destroy items, mattresses, kick the dog on the way out or anything like that. But I did tell her that she would know that a search was conducted at her residence." [42]

A few minutes after this exchange, and without further conversation, Ms. Miremadi told the agents that she was thinking of consenting to the search of her home and asked whether she could speak to her husband.[43] The agents pulled off the freeway and permitted the handcuffed Miremadis to converse alone in the back of one of the cars.[44] After approximately ten minutes, the Miremadis emerged from the car and told Agent Atkinson that they had a few more questions about the consent search.[45] Ms. Miremadi then raised concerns regarding her children being at the residence during the search, the manner in which the search would be conducted, and her wish to have their computer left at the house.[46] Ms. Miremadi contended that at this point she "feared that if I did not consent that (a) when the agents came back they would be destructive: (b) the children would be locked out of the house and would be unable [to] get their clothing; and (c) the computer would be taken indefinitely. I also believed, based on the agents' statements, that withholding consent was pointless, because the agents had stated, several times, that they were going to obtain a search warrant anyway." [47]

After some discussion with Agent Atkinson on these points, the Miremadis agreed that they would consent to the search and signed the consent form.[48] Handwritten on the form were two additional sentences: (1) "This document is being signed at 3:55 p.m. on 5/14/97 after both defendants, Valerie and Anthony Miremadi, have been advised by an attorney not to sign this document," and (2) "If the above agents are able to remove documents from the hard drive of the Miremadi's computer, the computer/hard drive will be left at the house." [49] Two of the agents returned to the Miremadis' home and conducted a thorough search of the entire residence.[50] "Thousands of documents," as well as the computer, were seized from the office area in the home.[51]

37. Tr. at 121, 141.

38. Tr. at 121–122.

39. Tr. at 122.

40. Tr. at 143.

41. Tr. at 122, 143.

42. Tr. at 122. When asked what he meant by the last statement, Peterson testified that he meant that "just as agents wouldn't destroy purposely any items nor would we put everything back in the exact place that she had it" but that he did not say this to Ms. Miremadi. *Id.*

43. Tr. at 123, 145.

44. Tr. at 29, 145.

45. Tr. at 29.

46. Tr. at 29–30, 145–47.

47. Miremadi Aff. ¶ 21.

48. Tr. at 31.

49. Gov. Br. Ex. 5; Tr. at 31–32.

50. Tr. at 33–34.

51. *Id.*

*Discussion*

## I. Miranda *Violation*

The Miremadis argue that Agent Atkinson questioned Ms. Miremadi in violation of *Miranda v. Arizona.*[52] As a consequence, they contend, the documents seized by Agent Atkinson as a result of those questions must be suppressed as "fruits of the poisonous tree" under the rule established in *Wong Sun v. United States.*[53] The government counters that Agent Atkinson did not question Ms. Miremadi. According to the government, Ms. Miremadi volunteered the documents in an effort to establish her innocence, thus rendering the lack of *Miranda* warnings immaterial because these documents were not products of custodial interrogation.

### A. *Standard For Suppression of Fruits of* Miranda *Violations*

■■■ Statements obtained in violation of *Miranda* must be suppressed irrespective of whether they are given voluntarily.[54] Where a defendant seeks to suppress post-arrest statements, the government bears the burden of establishing by a preponderance of the evidence that the statements were not the product of custodial interrogation conducted in the absence of *Miranda* warnings.[55] In this case, however, the Miremadis seek suppression not of any post-arrest statements, but of documents allegedly obtained as a consequence of illegal custodial questioning—the documents to which Valerie Miremadi led Agent Atkinson at the time of the arrest.

■■ Although the point was not raised or addressed by either party, the Court notes at the outset that the standard for suppression of physical evidence derived from *Miranda* violations has not been settled definitively by the Supreme Court or the Second Circuit.[56] In *Oregon v. Elstad,*[57] however, the Supreme Court refused to suppress a confession validly obtained after proper *Miranda* warnings purely because it came after a prior confession which had been the product of an unwarned, custodial interrogation. The Supreme Court recognized that the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun* forbids the use of evidence obtained as a result of a constitutional violation, but it found that the prophylactic rule of *Miranda* "sweeps more broadly than the Fifth Amendment itself."[58] A *Miranda* violation therefore does not necessarily preclude the use of all evidence flowing therefrom.[59] Derivative evidence is suppressed only where the Fifth Amendment itself is violated. which the *Elstad* Court held occurs where there is actual coercion in obtaining the confession.[60] On

52. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

53. 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

54. *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

55. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

56. *See United States v. Guzman,* No. S597 Cr. 786(SAS), 1998 WL 75672 at *6 (S.D.N.Y. Feb. 23, 1998).

57. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

58. *Elstad,* 470 U.S. at 306, 105 S.Ct. 1285.

59. *Elstad,* 470 U.S. at 306–09, 105 S.Ct. 1285 ("[A] procedural Miranda violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine.... [T]he Miranda presumption [of compulsion], though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.... It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.").

60. *Elstad,* 470 U.S. at 305, 105 S.Ct. 1285 ("Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions,") (quoting *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)); *see also New York v. Quarles,* 467 U.S. 649, 671 n. 4, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring) ("*Wong Sun* and its 'fruit of the poisonous tree' analysis lead to exclusion of derivative evidence only where the underlying police misconduct infringes a 'core' constitutional

the facts of *Elstad*, the Court concluded that there was no evidence of actual coercion and therefore that the second confession was not suppressible as a fruit of the original *Miranda* violation.

Although neither the Supreme Court nor this Circuit has extended *Elstad* to the fruits of a *Miranda* violation in the form of physical evidence, each of the other circuits to have considered the issue has construed *Elstad* to apply equally to all forms of derivative evidence.[61] In each case, the courts held that fruits of *Miranda* violations are to be suppressed only upon a showing of actual coercion. This Court concurs.

The *Elstad* Court defined actual coercion as "physical violence or other deliberate means calculated to break the suspect's will."[62] Thus, the test is first whether there was a *Miranda* violation and, if so, whether that statement was obtained through physical violence or other deliberate means of coercion.

### B. *Analysis*

In this case, it is undisputed that Ms. Miremadi did not receive *Miranda* warnings or their equivalent until after the initial group of documents—the Erpel folder and the papers on the desk—were seized. It is clear also that Ms. Miremadi was in custody from the time the agents arrived at her front door and told her that she was under arrest.[63] Whether Ms. Miremadi was subject to a *Miranda* violation therefore turns on whether or not she was interrogated before receiving the warnings.

■ The Supreme Court defines interrogation as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."[64] Ms. Miremadi claims that Agent Atkinson interrogated her when he asked whether she had any documents related to the Erpel transaction and, if so, whether he could see them. Agent Atkinson, however, denied asking any questions of Ms. Miremadi. He testified that Ms. Miremadi volunteered to show him the documents in an effort to establish her innocence.

■ There is no easy resolution of this conflict of testimony. The Court, however, need not decide whether Ms. Miremadi was interrogated because the documents would not be suppressible even if she was since there is no persuasive evidence of actual coercion at any time prior to this seizure. Mere failure to administer the *Miranda* warnings falls far short of the type of police misconduct which has been held to violate the Fifth Amendment.[65] As Ms. Miremadi's statements and actions regarding these docu-

right. Failure to administer *Miranda* warnings violates only a nonconstitutional prophylactic.").

61. *See, e.g., United States v. Elie*, 111 F.3d 1135, 1142 (4th Cir.1997) ("derivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never 'fruit of the poisonous tree' ") (citations omitted); *United States v. Mendez*, 27 F.3d 126, 130 (5th Cir.1994) ("The derivative evidence rule operates only when an actual constitutional violation occurs, as where a suspect confesses in response to coercion."); *United States v. Wiley*, 997 F.2d 378, 382–83 (8th Cir.) (upholding finding that consent to search following voluntary statement was valid), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993); *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1515 (6th Cir.1988) ("where police simply fail to administer Miranda warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment"); *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1048 (9th Cir.1990) ("where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by barring admission of the derivatively obtained evidence or statements."). *Cf. United States v. Morales*, 788 F.2d 883, 885–87 (2d Cir. 1986) (pre-*Miranda* statements permissibly used to determine probable cause to arrest).

62. *Elstad*, 470 U.S. at 312, 105 S.Ct. 1285.

63. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (finding that *Miranda* warnings are required where there is a formal arrest).

64. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

65. *See, e.g., Elstad*, 470 U.S. at 314 n. 3, 105 S.Ct. 1285 (discussing cases).

ments were voluntary, the documents are not suppressible under the Fifth Amendment.[66]

## II. Consent Search

The Miremadis argue also for suppression of the evidence seized from their home during the subsequent search on the theory that their consent was the product of coercion. The government counters that the consent was voluntary and that the agents reasonably relied on the Miremadis' signature on the consent form.

### A. Standard for Evaluating Voluntariness of Consent to Search

 ] The government has the burden of proving consent for a warrantless search of a home by a preponderance of the evidence.[67]

"The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[68] In this circuit, the test is an objective one—whether the agents had a reasonable basis for believing that there was valid consent to the search.[69] In applying this test, however, it is appropriate to consider the "particularities of the situation that is presented in any given case" and the "possibly vulnerable subjective state of the person who consents."[70] Other relevant factors are whether the defendant was in custody and in handcuffs,[71] whether there was a show of force,[72] whether the agents told the defendant that a search warrant would be obtained,[73] whether the defen-

---

**66.** Valerie Miremadi argues also that the seizure of the documents from the office area was illegal because Ms. Miremadi expressly denied Atkinson permission to take the Erpel file and there was no exception to the warrant requirement which allowed him to do so. In *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), the Supreme Court considered a situation very similar to the one presented here. It held that once an officer placed a student under lawful arrest, he was authorized to accompany the student into his room and "had a right to remain literally at [the defendant's] elbow at all times." *Id.* at 6, 102 S.Ct. 812. While in the defendant's room, the officer further had the right under the "plain view" exception to the Fourth Amendment warrant requirement to seize what clearly is incriminating evidence if it is in plain view. This was true even assuming *arguendo* that the officer was in the defendant's room only because of a violation of the defendant's Fifth Amendment rights—asking him for identification without giving prior *Miranda* warnings. *Id.* at 6 n. 3, 102 S.Ct. 812. Here, Ms. Miremadi was lawfully under arrest, and the documents were in plain view and clearly incriminating as they had the names of investors on them and inflated rates of return. There was therefore no Fourth Amendment violation in the seizure of the documents from Ms. Miremadi's office desk.

**67.** *Bumper v. State of North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

**68.** *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**69.** *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995) (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)); *see also, Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("Reasonableness [of the Fourth Amendment] is measured

in objective terms by examining the totality of the circumstances."). Other circuits have held to the contrary. *See, e.g., United States v. Hall,* 969 F.2d 1102 (D.C.Cir.) ("voluntariness inquiry turns not on whether a 'reasonable' person in the defendant's position would have felt compelled to consent to a police officer's request to search, but, rather, on whether the *accused herself* actually felt compelled to consent") (emphasis in original), *cert. denied,* 506 U.S. 980, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992); *United States v. Mendoza–Salgado,* 964 F.2d 993 (10th Cir.1992) (same); *United States v. Wilson,* 895 F.2d 168, 171 (4th Cir.1990) ("the determination of consent to search is subjective"). Other courts have applied a number of subjective factors, such as the consenter's age, education and intelligence, as a part of the "totality of the circumstances" test. *E.g., Valance v. Wisel,* 110 F.3d 1269 (7th Cir.1997); *United States v. Barnett,* 989 F.2d 546 (1st Cir.), *cert. denied,* 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993); *United States v. Chaidez,* 906 F.2d 377, 381 (8th Cir.1990).

**70.** *Schneckloth,* 412 U.S. at 227, 229, 93 S.Ct. 2041.

**71.** *E.g., United States v. Kim,* 25 F.3d 1426 (9th Cir.), *cert. denied,* 513 U.S. 1030, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994); *United States v. Kozinski,* 16 F.3d 795 (7th Cir.1994).

**72.** *E.g., United States v. McIntosh,* 857 F.2d 466 (8th Cir.1988).

**73.** *E.g., United States v. Severe,* 29 F.3d 444, 446 (8th Cir.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995); *United States v. Spires,* 3 F.3d 1234 (9th Cir.1993); *United States v. Faruolo,* 506 F.2d 490, 497 (2d Cir. 1974) (Newman, J., *concurring*) ("any intimation that the warrant will automatically be issued

dant had knowledge of the right to refuse consent,[74] and whether the defendant previously had refused to consent.[75]

## B. *Analysis*

The determination whether the agents had a reasonable basis for believing the Miremadis' consent was voluntary turns very much on the events leading up to their signing the consent form. The Court therefore must choose which of the disputed facts is more credible in order to resolve the Miremadis' Fourth Amendment challenge. After carefully considering the testimony and demeanor of all of the witnesses at the evidentiary hearing, the Court finds the following facts.

At the time of her arrest, Ms. Miremadi initially was very agitated and upset, a fact which was readily apparent to the agents. Ms. Miremadi led the agents into the office area, held up the Erpel file, and flipped through it in front of Agent Atkinson while protesting her innocence. Atkinson seized the file from her and certain documents from her desk, despite Ms. Miremadi saying that she did not give him permission to do so. Both Mr. and Ms. Miremadi expressed concern to the agents on several occasions regarding their children, and Ms. Miremadi was permitted to make temporary arrangements for their care. Later, both Agents Atkinson and Peterson told her that the children would be allowed back in the house quickly if the Miremadis consented to the search but would be prevented from returning to the premises for a day or two if they refused consent.

Agent Atkinson, further, told Ms. Miremadi that ninety-seven percent of people that the agents arrest are convicted, that she was facing a lot of jail time and that she would be better off if she cooperated with the investigation. After she refused to consent, he told

her that she was "making a big mistake," making it harder on herself, and that "it's just going to be harder this way." Agent Atkinson impressed upon Ms. Miremadi that he had seen lots of evidence of crime and that the agents would secure a warrant if she did not consent, a theme reiterated by Agent Peterson during the car ride. During the course of the ride to Los Angeles, Ms. Miremadi expressed concern about the possible destructiveness of a warranted search. While Agent Peterson said that her fears were unfounded, he told her also that she "would know that a search was conducted at her residence."

■ There is no doubt that the agents' initial efforts to obtain consent were met with unequivocal refusal. That refusal was reinforced by Agent Atkinson's conversation with Ms. Miremadi's attorney. Ms. Miremadi persisted in her refusal even after Agent Atkinson then told Ms. Miremadi that she was making it harder on herself and that her children would be locked out of the house until a search was conducted. The issue, then, is whether it was objectively reasonable for the agents to believe that the Miremadis' change of heart, en route to the Secret Service field office while handcuffed and in custody, was "the product of an essentially free and unconstrained choice"[76] and not the result of "duress or coercion, express or implied."[77] After considering the other circumstances leading up to the consent, it is apparent that the agents' conclusion that they possessed valid consent to search was not objectively reasonable.

The agents knew that Ms. Miremadi was emotionally upset by the arrest in her home by the armed agents. While she later calmed down somewhat, the agents must have known that her equanimity was not aided by statements such as "97 percent of the people that we arrest are convicted" and

should be considered as coercive as the announcement of an invalid warrant in *Bumper* [v. *North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ]").

74. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041 ("knowledge of the right to refuse consent is one factor to be taken into account" but not absolutely required in order to prove consent).

75. *E.g., United States v. Pulvano*, 629 F.2d 1151, 1154 (5th Cir.1980) (earlier denial of consent a factor).

76. *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041.

77. *Id.* at 227, 93 S.Ct. 2041.

that she was "in a lot of trouble," "facing a whole lot of jail time" and "would be better off if [she] cooperated with" the investigation.[78] Agent Atkinson, moreover, told her that "if that is how you want to do it, that is fine, but it's a big mistake. You are just going to make it harder on yourself. It's just going to be harder this way."[79]

The impact of these circumstances was compounded by the Miremadis' overtly manifested concern for the ability of their children to reenter the family home. The agents made clear that the children would be allowed in promptly if the Miremadis consented to a search but otherwise would not be allowed back inside until after a search warrant was obtained and executed, which might take a day or two.[80]

Finally, the agents were aware that the Miremadis were concerned also that a warranted search would result in needless damage to their property. While Agent Peterson's words to some degree should have allayed that fear, he nevertheless should have been aware that his statement that Ms. Miremadi "would know that a search was conducted"[81] could be considered by one in Ms. Miremadi's position as ominous and threatening.[82]

In all of the circumstances, the Court finds that the agents did not have a reasonable basis to believe that the Miremadis' consent was voluntary.[83] The objectively reasonable interpretation of the Miremadis' ultimate decision to consent was that it resulted from the agents' threats that a warrant would issue, that the children would be locked out of the house until it was executed, and that the house or its contents could be damaged in the inevitable search.[84] Although the Miremadis were aware of a right to refuse based on their conversation with their attorney, knowledge of a right to refuse is but one factor to consider.[85] And even a knowledgeable defendant's will eventually can be overborne by express or implied coercion.[86]

As the agents should have known that the

78. Tr. at 138.

79. Tr. at 141.

80. As discussed below, the agents were not certain that they would even apply for, much less obtain, a search warrant.

81. While a threat to obtain a warrant does not alone compel the conclusion that any subsequent consent must have been involuntary, in cases considering the issue generally the agent making the threat at the least has a well founded belief that there is probable cause for a warrant. See, e.g., United States v. Faruolo, 506 F.2d 490, 493–95 (2d Cir.1974) (discussing cases in which law enforcement agents had significant probable cause and finding their threats to obtain a warrant non-coercive). Here, by contrast, Atkinson testified at the evidentiary hearing that he was not sure whether they would be able to get a warrant, and Peterson knew nothing of the case and certainly had no basis for assessing whether there was probable cause to support a warrant.

82. The Court is well aware that it was Ms. Miremadi, not the agents, who raised the issue of possible damage in a warranted search and that Agent Peterson's response to her doubtless was literally true. Assuming, as the Court does, that his manner and tone of voice were not threatening, his response alone would not justify suppression. Given all of the other circumstances of the exchanges between the agents and Ms. Miremadi, however, Agent Peterson should have known

that Ms. Miremadi was likely to read a threat into his factual response.

83. There are obvious dangers in determining whether the agents had a reasonable basis for finding the consent voluntary where certain facts are known to certain of the agents present but not to others. In this case, however, each of the agents independently was aware of facts sufficient to alert him or her to the involuntariness of the Miremadis' consent.

84. The result would be the same were the test a subjective, rather than objective, one. Ms. Miremadi was upset and concerned about her children and home, as evidenced by her comments to the agents. She repeatedly was left with the impression that a search would be conducted regardless of whether she consented, that her children in the meantime would be refused access to their home, and that the search would be conducted in such a way that she would know the agents had been there. The Court finds that Ms. Miremadi consented only as the result of the agents' subtle coercion. Mr. Miremadi also was concerned about his children and, after conversing with his wife in the car, about his home. Given the vulnerable state of the defendants, it is clear that their consent was not "the product of an essentially free and unconstrained choice."

85. Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041.

86. See id. at 226, 93 S.Ct. 2041.

consent was not voluntarily given,[87] the evidence seized from the Miremadis' home, other than the documents discussed above, must be suppressed unless an exception to the exclusionary rule exists.

## C. Inevitable Discovery

The government contends that the documents should not be suppressed, even if illegally seized, because they inevitably would have been discovered through use of a search warrant. It argues that the agents would have sought a search warrant after the arrests, that the warrant would have issued because the agents then had probable cause to believe that illegal activity was being conducted in the Miremadis' home, and that all of the documents seized during the "consent" search would have been discovered.

The Supreme Court first recognized the inevitable discovery doctrine in *Nix v. Williams*.[88] In *Nix*, the police illegally questioned the defendant and, as a result, learned the whereabouts of a murder victim's body. Although the location of the body would have been suppressible as the product of a violation of the Sixth Amendment, the Supreme Court nevertheless admitted it because a search party, methodically scouring a defined expanse, was only a couple of miles from the body at the time of the illegal questioning and inevitably would have discovered it within the next several hours. The test, according to *Nix*, is whether the government has shown by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means.[89]

The inevitable discovery doctrine is not without its limits. In *United States v. Cabassa*,[90] the Second Circuit considered a situation, like this one, in which the district court had applied the doctrine premised upon the government's expected issuance of a search warrant. The government there was in the "final stages" of obtaining a warrant to search a home reportedly containing drugs when one of the officers became impatient and, without waiting for the warrant, entered the home and searched it. It argued that the warrant certainly would have issued based on the information that the agents would have included in the warrant application and that the evidence ultimately would have been seized pursuant to that warrant.

On those facts, the Second Circuit rejected application of the inevitable discovery doctrine. The *Cabassa* court found especially relevant to its determination "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"[91] because it informs both the determination "whether a warrant would in fact have issued" and "whether the same evidence would have been discovered pursuant to the warrant."[92] It assessed also the strength of the government's warrant application at the time of the search. It found that "the government never actually obtained a warrant, [that] the government's showing of probable cause was not 'overwhelming'"[93] and therefore that inevitable discovery did not apply. "At best, the government's showing in the instant matter would support separate findings that more probably than not a warrant would eventually have issued and that more probably than not the evidence would have been [in the same place] when a lawful search occurred. Either of these findings is susceptible to factual error ... and the combined chance of error undermines the conclusion that discovery of the evidence pursuant to a lawful search was inevitable."[94]

---

87. This conclusion applies also to Mr. Miremadi's consent. While he was not present during many of the exchanges between Ms. Miremadi and the agents, the agents were bound to infer that Ms. Miremadi communicated all of her concerns to him when the two were permitted to confer in the back of the agents' car immediately prior to the signing of the consent form.

88. 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

89. *Id.* at 444, 104 S.Ct. 2501.

90. 62 F.3d 470 (2d Cir.1995).

91. *Id.* at 473.

92. *Id.*

93. *Id.*

94. *Id.*

As in *Cabassa*, the government argues in this case that it had probable cause for a search after the arrests based on the "ample material" that the agents viewed while lawfully in the Miremadis' home, that the agents subsequently would have sought a search warrant for the home, that the magistrate would have issued the warrant, and that the documents still would have been there when the warrant eventually was executed.[95] *Cabassa*, however, counsels that the government must show, by a preponderance of the evidence, the *inevitability* of the discovery.[96] It refused to find inevitability even where there was a showing of probable cause and where the government already was in the process of applying for a warrant when the illegal search occurred. The Circuit contrasted its earlier decision in *United States v. Whitehorn*,[97] in which the doctrine was held to apply where there had been overwhelming probable cause for a warrant, a warrant already had been applied for, and in fact a warrant issued six hours after the illegal search. Because the facts of this case reveal that the likelihood of the discovery of the evidence was even more remote than in *Cabassa*, and far less remote than in *Whitehorn*, the Court is constrained by those precedents to find that here there was an insufficient showing of inevitability.

██ To begin with, the government here has failed to demonstrate that the agents inevitably would have applied for a warrant. Although the Miremadis were told that the agents would get a warrant if they did not consent to a search, the agents actually were far from sure that they even would make that effort. The AUSA told them prior to executing the arrest warrant that there was insufficient basis for a search warrant.[98] While Agent Atkinson indicated some inclination to revisit the issue following the arrest— saying that he was "going to try to reach out to the AUSA here in New York and advise her of the situation . . . and we were *possibly* going to try to get a search warrant for the residence"[99]—his conduct suggests otherwise. He explained the failure to leave anyone behind to guard the premises while the agents escorted the Miremadis downtown on the basis that they "weren't sure if we were going to be able to get a warrant."[100] Thus, based on the government's own testimony, the Court is not persuaded that the agents inevitably would have sought a warrant.[101] Indeed, Agent Atkinson testified with respect to whether he would have obtained a warrant: "Q It wasn't a sure thing. It wasn't inevitable. A No."[102]

Finally, the government has not established that the documents inevitably would have remained in the house by the time a warrant was obtained and executed. Despite their knowledge that evidence might disappear,[103] the agents left the house without taking any steps to ensure that the documents would remain there while they sought a warrant.[104] Although they did not know whether others had keys to the premises[105] or whether other co-conspirators would have access to the home while they sought a war-

---

95. Gov. Br. 20 n. 6, 25.

96. *Cabassa*, 62 F.3d at 474.

97. 829 F.2d 1225 (2d Cir.1987), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988).

98. Tr. at 49–50.

99. Tr. at 23 (emphasis added).

100. Tr. at 24. Atkinson testified also that they did not leave anyone behind to guard the premises because they did not have the personnel to do so. *Id.* This contention is seriously undermined by the fact that, after receiving the Miremadis' consent, Agents Atkinson and Damos returned to search the home, permitting the Miremadis to be taken downtown by Agents Marengo and Peterson.

101. The testimony that Agents Atkinson and Peterson told the Miremadis that a warrant ultimately would issue is not to the contrary. The Court finds that the agents threatened that a warrant would issue despite their own personal reservations about whether there was sufficient probable cause for a search warrant.

102. Tr. at 50.

103. Tr. at 48–49.

104. Tr. at 23.

105. Tr. at 48.

rant,[106] the agents did not seal the house or leave anyone to guard the premises.[107]

At the time of the alleged consent, moreover, the agents were still an hour's drive from downtown Los Angeles. By the time they reached their headquarters it would have been close to 8 p.m. in New York, where the Assistant United States Attorney was located. It would have taken at least a day or two to reach the Assistant, draft and submit a warrant application, secure the warrant and then execute it in California. As the Second Circuit found in *Cabassa*, "[i]f the process of obtaining a search warrant has barely begun.... the inevitability of discovery is lessened by the probability, under all the circumstances of the case, that the evidence in question would no longer have been at the location of the illegal search when the warrant actually issued." [108]

Certainly it is possible that a search warrant ultimately would have issued and the documents been discovered. As the Supreme Court instructed in *Nix*, however, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." [109] If the issuance and prompt execution of a search warrant were foregone conclusions, the government would be on solid ground. But this is not such a case.

The government has failed to establish by a preponderance of the evidence that the documents that were seized pursuant to the "consent" search inevitably would have been discovered by legal means absent the illegal search. Thus, the agents' unwarranted seizure of documents pursuant to an involuntary consent requires suppression of the documents.[110]

106. Tr. at 48–49.

107. Tr. at 24.

108. 62 F.3d at 473.

109. *Nix v. Williams,* 467 U.S. 431, 444 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

110. The defendants argue also that the documents must be suppressed because the agents violated the rule laid out by the Supreme Court in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct.

*Conclusion*

The Court finds that the documents seized from the office area of the Miremadi home are not suppressible because they were not obtained by use of actual coercion. The motion to suppress those documents is therefore denied.

The Court finds further that the Miremadis' consent to search their home was involuntarily given and that the documents seized during the search of the home would not have been discovered inevitably. Therefore, the motion to suppress those documents is granted.

SO ORDERED.

1880, 68 L.Ed.2d 378 (1981), that once a suspect has invoked her right to counsel or to remain silent, the invocation must be scrupulously honored and all questioning must cease. *See also Campaneria v. Reid,* 891 F.2d 1014 (2d Cir.1989), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). The Court need not reach this issue, however, as it concludes that the Miremadis did not voluntarily consent to the search in any event.