**UNITED STATES of America,
Plaintiff,**

v.

**Larry Jermaine BATTLE,
JR., Defendant.**

**No. 00–10059–01–JTM.**

United States District Court,
D. Kansas.

Oct. 12, 2000.

David J. Phillips, Office of Federal Public Defender, Kansas City, Cyd K. Gilman, Office of Federal Public Defender, Wichita, KS, Ronald E. Wurtz, Melody J. Evans, Office of Federal Public Defender, Topeka, KS, Robert Nigh, Tulsa, OK, John. Wachtel, Klenda Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, E. Jay Greeno, Greeno & Boohar, Wichita, KS, for Defendant.

Lanny D. Welch, Office of U.S. Atty., Wichita, KS, for U.S.

*MEMORANDUM AND ORDER*

MARTEN, District Judge.

This matter is before the court on various defense motions, as follows: Motion to

Suppress Evidence (dkt. no. 126), Motion to Dismiss Indictment for Lack of Jurisdiction (dkt. no. 129), Motion to Disclose Expert Testimony (dkt. no. 130), and Motion to Dismiss or Require Election regarding Counts Two and Three (dkt. no. 132). These motions are fully briefed and a hearing was held on September 29, 2000. Following the hearing, the court took these matters under advisement and is now prepared to rule. For the following reasons, defendant's motion to suppress is denied; the motion to dismiss indictment for lack of jurisdiction is denied; the motion to disclose expert testimony is granted in part, as set forth herein; and the motion to dismiss or require election is denied as moot.

## I. Preliminary Motions

The court will briefly address the preliminary motions before considering the defendant's motion to suppress. First, the defendant moves to dismiss the indictment against him alleging lack of federal jurisdiction. The government originally charged defendant Battle with three crimes: Hobbs Act Robbery pursuant to 18 U.S.C. § 1951(a), firearm use resulting in death during the commission of said robbery pursuant to 18 U.S.C. § 924(j), and firearm use in the commission of said robbery pursuant to 18 U.S.C. § 924(c). Defendant argues that the court is without jurisdiction over these charges because Congress lacks authority, under its commerce power, to establish criminal sanctions for robbery. Under current law, defendant's argument must fail and the court thus denies defendant's motion. *See United ed States v. Malone*, 222 F.3d 1286, 1294, 1295 (10th Cir.2000) (holding that the Hobbs Act was within Congress' commerce power and that the government need only show some de minimis effect on interstate commerce to prove the jurisdictional nexus under the Hobbs Act).

Second, the superseding indictment filed on September 19, 2000 has rendered moot defendant's motion to dismiss or require election regarding counts two and three. The superseding indictment excludes count three of the original indictment. The court thus denies defendant's motion as moot.

Third, defendant moves the court to order additional disclosure of the government's expert reports pursuant to Fed. R.Crim.P. 16(a)(1)(E). The government has provided defendant with reports from the firearm/footwear examiner and the medical examiner as it must under Rule 16(a)(1)(D), as well as the *curriculum vitae* of the two experts. Defendant seeks additional information regarding the proposed testimony of the firearm/footwear examiner. The court hereby orders the government to disclose all previously undisclosed Rule 16(a)(1)(E) material and to respond to any further specific defense requests for information.

## II. Factual Background

On March 29, 2000, at approximately 12:14 p.m., two men robbed a Phillips 66 Service Station located at 2828 E. 21st Street North, Wichita, Kansas. Mr. Lee, the store's proprietor, was at the cash register during the robbery and his wife, Ms. Ho, was in the store's backroom. Lee's wife, upon seeing the robbers enter the store on a closed circuit security camera, sounded the store alarm. According to Ms. Ho's account, the men took money from the cash register and, as they were leaving the store, one fired a sawed-off shotgun at Mr. Lee striking his torso. Mr. Lee died of the gunshot wound shortly thereafter. Wichita police officers, responding to the alarm and subsequent 911 call by Ms. Ho, arrived at the scene moments after the suspects fled. Ms. Ho described the suspects as two black males approximately 20 years of age.

Witnesses reported to police that two black males, one with a shotgun, were seen running through the open backyard of 2223 N. Chautauqua in Wichita, Kansas. Due to recent rainfall, officers were able to locate several footprints and to thereby follow the direction of the suspects. While on the suspects' trail, an officer recovered

a sawed-off, double-barrel shotgun from a trash can. Officers also found three gloves, a bandana, and a $1.00 bill. Police continued to follow the footprints until the trail disappeared at approximately the corner of 22nd and Lorraine Streets in Wichita, Kansas. While canvassing the block, officers noticed two persons walking from 2349 N. Lorraine to 2343 N. Lorraine. Officers approached the rear of 2349 N. Lorraine and found footprints similar to those at the crime scene. Officer Alverson of the Wichita Police Department spoke with the occupant of 2349 N. Lorraine, who introduced herself as Camille Williams. Williams stated that no one else was in the residence, which was confirmed when the police searched her house. Police asked Williams about the persons seen leaving her house and she indicated that one was her cousin and neighbor, Carmel McCoy.

Police then went to 2343 N. Lorraine to confirm that Ms. McCoy had left Williams' house. Officers Alverson and Mitchell spoke with Carmel McCoy through a closed screen door. Ms. McCoy immediately denied consent to search the house. She stated that only she and her three-year-old daughter were at the residence, but soon admitted that her neighbor was also in the house. Upon police request, Ms. McCoy retrieved Emil Rhodes from within the house. Police again asked Ms. McCoy if they could search her residence since violent crime suspects were in the area. Ms. McCoy indicated that she could not consent to a search because she was only a visitor at the house, which belonged to her grandmother. Officer Alverson then went back to Ms. Williams' residence and questioned her regarding the occupants of 2343 N. Lorraine. Williams indicated that Ms. McCoy and her boyfriend, Jermaine Battle, lived at the residence and that McCoy's grandmother lived out of state. Officer Alverson returned to 2343 N. Lorraine and told Ms. McCoy that, because she resided in the house, she could consent to a search, but she refused.

At this point, Lt. Speer of the Wichita Police Department arrived and began to speak with Carmel McCoy. He questioned her about the presence of other people in the residence and requested consent to search. Ms. McCoy again denied consent. Lt. Speer then ordered her to stand back from the door, and he posted Officer Salcido to block further entry. He informed Ms. McCoy that the police were going to obtain a search warrant and that they needed to secure the house in the interim. At this point, McCoy stated that Jermaine Battle was inside and that she hadn't told police earlier because Battle was barred from the residence due to prior domestic violence incidents. Speer assured her that the police were not concerned about the domestic violence issues. Ms. McCoy then called into the house for Battle who exited peaceably. Speer obtained Battle's name, patted him down, and asked Officer Alverson to take Battle to a patrol car. Officer Alverson immediately Mirandized Mr. Battle and asked him if he would be willing to go to the FBI Violent Crimes Task Force Office. Mr. Battle agreed and was not arrested.

After Mr. Battle was in the patrol car, Ms. McCoy did consent to a search of the house. To clarify the consent, an officer read and she signed a written consent form. Police entered the house, but did not seize any evidence until after a search warrant was obtained later in the evening. Ms. McCoy also agreed to go to the Task Force Office for questioning.

Ms. McCoy did testify that the police coerced her consent by stating, in a conversation between the officers, that they should call SRS to take the children. She testified that she overheard the conversation among Lt. Speer and another two officers. However, Lt. Speer testified he neither made nor heard any such statement and that there would be no reason for such a discussion to occur simply because police had decided to seek a warrant. At that time, Ms. McCoy was not under suspicion and it would make little sense for the officers to have an internal conversation, among themselves, about the need to

obtain state custody of the children when McCoy's arrest was not anticipated. The court thus finds that police did not threaten Ms. McCoy with placing her children in SRS custody. Ms. McCoy's children were entrusted to the safekeeping of a neighbor while Ms. McCoy went to the Task Force Office for questioning. Perhaps Ms. McCoy overheard police making this arrangement, but if she mentally construed this as a threat to obtain SRS custody, it cannot be considered official coercion.

At the FBI Task Force Office, Mr. Battle was placed in an interview room at approximately 2:15 p.m. He remained in the interview room until approximately 4:00 p.m., at which time Task Force Agents Pritchett and Nevil began to interview him. The agents assessed Battle's mental state and Mirandized him. The agents provided Mr. Battle with a waiver of rights form, which they fully explained to him. Mr. Battle signed the waiver. The agents then confronted Battle with the facts discovered earlier in the day and he confessed to the robbery and shooting, providing significant detail. The confession was complete by approximately 6:00 p.m.

Mr. Battle testified that he confessed to these crimes because he heard Ms. McCoy crying and a voice telling her that the SRS was going to take her children. However, Ms. McCoy testified clearly that police made no such statement at the Task Force Office. Further, every officer that had contact with Ms. McCoy testified that they neither made nor heard any such statement. The court finds that Mr. Battle did not overhear threats regarding the SRS.

After the confession, Agent Steven Nevil prepared an affidavit in support of an application for a search warrant for 2343 N. Lorraine. The affidavit contained the observations of police officers leading up to and during the confrontation at 2343 N. Lorraine, including that Mr. Battle had come out of the house. The affidavit included Mr. Battle's statement that he returned, after the robbery and shooting, to 2343 N. Lorraine and that both the clothes

worn during the robbery and the proceeds were there. Finally, the affidavit erroneously stated that footprints were found outside 2343 N. Lorraine instead of 2349 next door. Due to the error, the court excludes this fact from subsequent probable cause determination. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *Franks* involved the invalidation of a warrant based on intentionally or recklessly false statements in an affidavit that are material to the finding of probable cause. Defendant Battle has not shown that the statement was intentionally or recklessly made. Additionally, the court finds that the footprint evidence is largely irrelevant to a finding of probable cause in this case. However, as the footprint evidence was erroneously conveyed, the court considers whether the remainder of the affidavit, without the erroneous statement, can support a finding of probable cause.

Agent Nevil presented the affidavit to the magistrate judge who issued a warrant for the immediate search of 2343 N. Lorraine. The warrant is valid on its face; being issued by a neutral and detached magistrate, it particularly described the place to be searched and the items to be seized. *See Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). Police conducted the search between 11:20 p.m. and midnight of March 29, 2000. They seized shotgun shells, $170 in currency in a bread sack, and various articles of clothing. Defendant Battle now argues that the search of 2343 N. Lorraine was illegal and that police coerced his confession.

### III. Discussion

Battle's arguments proceed in a circuitous fashion that lead him to the conclusion that the court should suppress both his confession and all evidence seized from 2343 N. Lorraine. According to the defendant, illegal police behavior coerced Ms. McCoy's consent, which is the poisonous tree bearing the fruit of Battle's confession. Alternatively, defendant argues that police actually coerced his confession. Un-

der either argument, if the court suppresses defendant's confession, then there would arguably not be probable cause to support the search warrant. Absent a valid warrant, the seized evidence would be excluded. The court will consider these issues chronologically.

## A. Standing

The court finds, as an initial matter, that defendant Battle has standing to object to the search of 2343 N. Lorraine. The Supreme Court has imposed a standing requirement so that an individual may seek to suppress seized evidence only if the search or seizure violates his own reasonable expectations of privacy. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Battle clearly has standing, as a resident of 2343 N. Lorraine, to object to the search and seizure.

## B. Carmel McCoy's Consent was Voluntary

There is no question that Ms. McCoy had authority to consent to the entry. The only issue is whether Ms. McCoy's consent was voluntary. The case of *Schneckloth v. Bustamonte*, 412 U.S. 218, 227–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), instructs that a valid consent must be voluntary and intelligent under a "totality of the circumstances." *Id.* The consent must not be the result of official duress or coercion, express or implied. *Id.* The government has the burden of proving consent by a preponderance of the evidence. *Bumper v. State of North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ Defendant Battle argues the coerciveness of two specific police actions. First, he asserts that police statements to Ms. McCoy indicating that they would obtain a warrant were coercive. However, "[i]t is well-settled that the agent's statements to the effect that he would obtain a warrant if [the party] did not consent to the search does not taint [the party's] con-

sent to a search." *United States v. Creech*, 52 F.Supp.2d 1221, 1227 (D.Kan. 1998). The Tenth Circuit affirmed this ruling by stating that "where some basis exists to support an application for a search warrant, an officer's expressed intention to seek a search warrant in the absence of consent does not render a consent involuntary." *United States v. Creech*, 221 F.3d 1353, 2000 WL 1014868, at *2 (10th Cir.2000) (unpublished disposition) (citing *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992) (holding that where officer's expressed intention to obtain a search warrant was genuine and not merely a pretext to induce submission, such intention did not vitiate consent)).

The court finds that Lt. Speer's expressed intention to obtain a search warrant was certainly justifiable in light of the evidence police had already gathered. The police had found footprints in the yard of 2349 N. Lorraine similar to those at the scene of the robbery. The police had witnessed individuals proceeding from 2349 to 2343 N. Lorraine. Ms. McCoy had lied to the police regarding the occupants and ownership of her house. The police had learned from Ms. McCoy's neighbor that a man named Jermaine Battle lived at 2343 N. Lorraine. Perhaps this evidence would not support a finding of probable cause, but probable cause is not required. Here, the court must determine whether the officers had "some basis [ ] to support an application for a search warrant." *Id.* Given the facts set out above, the court finds that the police had a reasonable basis to conclude that a suspect was in the house and that the officers had a good faith intention to seek a warrant. The evidence simply fails to support defendant's claim that the expressed intention to seek a warrant was merely a pretext to obtain Ms. McCoy's consent.

■ Defendant Battle next argues that police coerced Ms. McCoy's consent by denying her reentry to the residence knowing a child was inside.[1] Battle sug-

---

1. Of course, Mr. Battle also argues that alleged police threats regarding SRS custody of

Ms. McCoy's children were also coercive. As

gests that the officers' actions were coercive in that they threatened the welfare of Ms. McCoy's children and took advantage of her maternal instinct. Defendant correctly states that antagonistic actions against a suspect's family would obviate the voluntariness of consent. *See, e.g., United States v. Hurston,* 12 F.Supp.2d 630, 637 (E.D.Mich.1998) (suspect did not give consent to search home voluntarily, in light of "hectic" police entry, in which police "rounded up" suspect's children and fiancee); *United States v. Eggers,* 21 F.Supp.2d 261, 270–71 (S.D.N.Y.1998) (police statement that suspect's children would be locked out of the house until a search was executed constituted duress and coercion, annulling resultant consent); *U.S. v. Ivy,* 165 F.3d 397 (6th Cir.1998) (taking a child from the mother's arms and threatening to take the child away constituted coercion). However, for the reasons discussed below, the officers's actions in this case are readily distinguishable from the preceding cases.

Considering the "totality of the circumstances," blocking Ms. McCoy temporarily from reentry into her home was not coercive police conduct. Cases invalidating consent on this basis, such as those cited above, involve direct and inexcusable official threats or action against a suspect's family. This situation is significantly different. At the time Lt. Speer told Ms. McCoy not to reenter the house, he had reason to believe that a potentially violent suspect was in the house. According to testimony of Lt. Speer at the hearing, standard procedure dictates that, in such situations, police should prevent entry into the house due to the risk of a hostage situation. The officers did know that a child was inside the house. This forced the police to select between two bad alternatives. The court finds that the police's decision to prohibit Ms. McCoy's reentry was motivated by safety concerns and not a desire to coerce consent.

The court recognizes that the police action may have influenced Ms. McCoy's consent indirectly, but that does not equate to "**official** duress or coercion." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (emphasis added). Any consent, confession or statement involves some degree of influence or compulsion. For instance, perhaps a suspect gives a statement or consents to a search because of a hope for leniency, because of religious dictates, or because the suspect is late to pick up a child and doesn't want further police-related delays. All of these situations involve compulsion on a suspect's decision that can be indirectly linked to police action and yet none of these circumstances involve **official coercion**. While Ms. McCoy may have given consent in order to regain access to her children, this motivation is merely an indirect incident of an appropriate police decision to secure her safety. The police did not directly threaten nor harm Ms. McCoy's children and any compulsion she may have felt is incidental to police actions necessitated by a dangerous situation. The court finds that police actions in barring reentry to 2343 N. Lorraine were not "official duress or coercion." *Id.* The court further finds that Ms. McCoy's consent to search was "voluntary and intelligent."

Shortly after police blocked Ms. McCoy's reentry, she agreed to call defendant Battle out of the house. As a result, the defendant exited the residence peaceably and accompanied police immediately to a waiting patrol car. Since the court finds no "primary illegality" prior to defendant Battle's exit, police contact with Battle could not flow from an "exploitation of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The court thus finds that Battle's confession is not a fruit of prior illegality.

noted above, the court finds, after hearing substantial testimony on the matter, that the police did not threaten to call the SRS while

at 2343 N. Lorraine. Thus, the court is left to consider solely the police action of barring Ms. McCoy's reentry into the premises.

After defendant Battle was out of the area, police obtained Ms. McCoy's written consent to search the house for other possible suspects. Police entered 2343 N. Lorraine and searched some clothing, finding a shotgun shell, but did not locate any other suspects. Defendant argues, however, that this search was illegal because the scope of Ms. McCoy's consent was arguably limited to a search for persons. Having perused the evidence log, the court finds that no evidence was seized incident to this initial search. Additionally, the affidavit in application for the search warrant contained no mention of the results of the initial search. Hence, even if the court were to find the initial search illegal, the search yielded no fruits which would require suppression. The court thus declines to rule on the issue of whether police exceeded the scope of Ms. McCoy's consent.

## C. Defendant Battle's Confession was Voluntary and Proper

■ As set out above, the court finds that Mr. Battle's confession is not the fruit of prior police illegality. The court also finds that Mr. Battle was Mirandized prior to police interrogation and that he knowingly, voluntarily, and intelligently waived his Miranda rights by reading and signing a waiver of rights form. The only question is whether, pursuant to the Due Process Clause of the Fourteenth Amendment, defendant's confession was voluntary. Voluntariness is assessed according to the totality of the circumstances considering such things as the suspect's age, education, and mental and physical condition, along with the setting, duration, and manner of police interrogation. *See Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). Only official coercion will render a confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

At the outset of police interrogation, Task Force agents assessed Mr. Battle's mental condition, finding him to be calm, cordial, and friendly. Mr. Battle denied recent usage of alcohol, narcotics, or prescription drugs, and indicated that he had not sustained any recent head injuries nor other physical injuries. Police began interviewing Mr. Battle at approximately 4:00 p.m. and the confession was completed shortly before 6:00 p.m. Agents Mirandized Battle, assessed his mental state, obtained a waiver, and quickly confronted the suspect with the facts against him. The court finds that the above facts reveal nothing but the appropriate police behavior.

Battle claims, however, that during his interrogation, he overheard Ms. McCoy crying and a voice telling her that SRS was coming to take her children. As mentioned above, both Ms. McCoy and the officers in contact with her testified that the SRS was not mentioned at the Task Force Office. Based on the weight of the testimony, the court finds that officers did not threaten Ms. McCoy and Mr. Battle thus could not have overheard such a statement.

## D. Search Warrant for 2343 N. Lorraine, issued March 29, 2000, is Valid

■ As noted previously, the search warrant is valid on its face. A neutral and detached magistrate issued the warrant which particularly identified both the place to be searched and the things to be seized. The only question is whether the search warrant is based on probable cause established through the affidavit of Agent Nevil. The affidavit presents the facts leading up to Mr. Battle's interrogation and the contents of Mr. Battle's confession. Battle's confession indicated that he committed the robbery, he shot the store clerk, he returned to 2343 N. Lorraine depositing a shotgun in a trash can along the way, and he stashed the clothing worn and money obtained during the robbery at 2343 N. Lorraine. It is clear to the court that the affidavit contained sufficient facts to enable the magistrate to make an independent evaluation finding probable cause to believe that seizable evidence would be

found at 2343 N. Lorraine. The warrant is thus valid. *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (warrant will issue only upon probable cause to believe that seizable evidence is on the specified premises); *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (affidavit must present sufficient facts for an independent determination and not merely rely on the officer's conclusions).

## IV. Conclusion

The officers' actions toward Ms. McCoy at 2343 N. Lorraine were appropriate and legal. Police did not coerce her either into calling for Mr. Battle to exit the residence or into consenting to a search of the residence. Absent a prior illegality, Battle's confession cannot be the fruit thereof. Additionally, the police properly obtained Battle's voluntary confession, which the court will not suppress. The magistrate issued a warrant for the search of 2343 N. Lorraine upon probable cause established primarily by Mr. Battle's confession. Upon execution of the warrant, police properly seized the evidence that is the subject of this suppression motion. The court thus denies defendant Battle's motion to suppress in its entirety.

IT IS THEREFORE ORDERED this _____ day of October, 2000, that defendant's motion to suppress (dkt no. 126) is denied; the motion to dismiss indictment for lack of jurisdiction (dkt. no. 129) is denied; the motion to disclose expert testimony (dkt. no. 130) is granted in part, as set forth herein; and the motion to dismiss or require election (dkt. no. 132) is denied as moot.